# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 15-9092-CM |
| AFAQ AHMED MALIK, | ) ) |
| Defendant. | ) ) |

## MEMORANDUM AND ORDER

Plaintiff United States of America brought this denaturalization action, seeking to revoke and set aside defendant Afaq Ahmed Malik's citizenship and cancel his Certificate of Naturalization. The court conducted a bench trial in October 2018. The parties later submitted proposed findings of fact and conclusions of law. The court has now reviewed all of the briefing, as well as the evidence in the case, and issues the following findings of fact and conclusions of law.

As will be demonstrated below, the overriding issue with plaintiff's case is a lack of reliable, clear, unequivocal, and convincing evidence about what happened during defendant's immigration-related interviews and what information was material to the interviewers. Defendant has conceded that his various immigration forms contained incorrect information (actually, no information) about his prior marriage and children. But what was discussed in interviews about those forms is not clear from the record. Simply put, plaintiff did not meet its high burden of showing that (1) defendant was not divorced when he married a United States citizen in 2000; (2) defendant withheld information about his ex-wife and children with the intent to gain an immigration benefit; and (3) that the adjudicators would have made different decisions had they known about plaintiff's ex-wife and children. The

-1-

government must meet a high burden of proof for the court to set aside a grant of citizenship. That burden has not been not met here.

## **Findings of Fact**

**I. Factual Background**

### *A. Defendant's Background*

1. Defendant was born in 1964 in Pakistan and married Kaneez Fatima in Pakistan in December 1995. He and Fatima have three children together.

2. Defendant divorced Fatima in 2000. He began divorce proceedings in March 2000 with the Union Council in Bhara Kahu, Pakistan. Defendant's brother Ishfaq Malik witnessed the divorce.

3. Defendant visited the United States in 2000 on a temporary visa with no plans to stay. He met a woman named Venita McIntosh (hereinafter "McIntosh," although for seven years, she went by the last name "Malik") and her adult son, Richard McIntosh, who was quadriplegic.

4. Defendant and McIntosh married on October 23, 2000, in Raytown, Missouri. McIntosh testified that they were in love with each other. Defendant also testified in his deposition that the marriage with McIntosh was based on love. The court finds the testimony of both credible on this point.

5. Defendant did not tell his new wife he had an ex-wife and children in Pakistan.

6. After they married, McIntosh and defendant joined their lives together as married couples often do—filing their taxes together, leasing a home, purchasing cars and insurance together, reflecting their mutual residence on their driver's licenses, sharing responsibility for their utilities, and spending time together as a family.

7. Eventually, in 2007, defendant and McIntosh divorced. Defendant then remarried Fatima in Pakistan.

8. In 2011, defendant submitted forms to request that two of his children be allowed to live permanently in the United States. On those forms, defendant represented that the date and place of his present marriage were 12/17/1995 and Pakistan (instead of the 2007 date of his remarriage to Fatima). The court does not find this fact to be conclusive—or even persuasive—evidence that defendant remained married to Fatima continually from 1995. Instead, the representation appears to the court to be a reasonable misunderstanding of how defendant should answer the question, particularly since the children were born during the first marriage to Fatima.

9. In 2014, the government notified defendant that he was the target of a denaturalization case, alleging that defendant had never gotten divorced in Pakistan. Defendant then asked his brother Ishfaq Malik to obtain a copy of his original divorce documents from the Union Council's office in Bhara Kahu, Pakistan. Ishfaq Malik did so.

10. Plaintiff raised questions about the ongoing record-keeping by the Union Council's office in Bhara Kahu, Pakistan. In response, defendant hired an attorney to file a complaint for declaratory judgment and injunctive relief in Pakistan. The court determined the divorce was legally binding as of its execution in 2000 and compelled the Union Council in Bhara Kahu, Pakistan to keep an accurate record of the divorce.

11. Drew Bazil testified at trial that the divorce papers were not authentic. The court does not exclude the testimony of Bazil, as requested by defendant, but considered his testimony as lay opinion testimony. That said, the court found Bazil's testimony about the age and authenticity of the documents unpersuasive. Bazil did not have extensive experience at the time he

evaluated the documents and did not offer sufficient reasoning for his conclusions. Bazil also did not consider key evidence in reaching his conclusions, such as how and where the documents were stored. The court gives the testimony of Bazil very little weight in considering whether defendant divorced Fatima in 2000.

12. Likewise, the testimony of Ryan Long was not persuasive on any relevant matters. Again, the court finds no reason to exclude the lay opinion testimony of Long, but instead has evaluated it in the context of the other evidence and finds it not persuasive and only marginally relevant. Long also did not have substantial experience at the time he worked in Pakistan. He did not speak or read Urdu, and he was not familiar with Pakistani law. His testimony on various points was inconsistent, and the court finds that he failed to establish that defendant's 2007 marriage to Fatima was not a remarriage after a prior divorce.

### B. *Defendant's Lawful Permanent Resident Status*

13. After marrying in 2000, McIntosh and defendant filed immigration forms for defendant to remain in the United States as a permanent resident. McIntosh submitted an immigrant visa petition on Form I-130 and defendant filed a Form I-485 application for adjustment of status.

14. It is unclear who completed these forms; United States Citizenship and Immigrations Services (USCIS) Officer Angela Firuccia conceded there is no way to tell from the forms themselves. Firuccia acknowledged that McIntosh may have completed these forms, and plaintiff did not ask McIntosh at trial if she had filled them out. Defendant does not remember filling out the forms. But he believes that if he did, he likely had help, given his limited English at the time.

15. The visa forms did not list defendant as having any ex-wife or children.

16. Having an ex-wife and children in the applicant's home country is not a reason to deny adjustment of status. The USCIS does, in fact, grant adjustment of status to divorced applicants, if they meet the requirements for adjustment.

17. McIntosh and defendant submitted evidence to the government to prove their marriage was bona fide. They submitted their marriage certificate, joint taxes for the years 2000 through 2003, joint lease agreements, joint car titles, their car insurance policy, their driver's licenses showing mutual addresses, their joint bank statements from their shared bank account, their joint utility bills, and various photos of them together with their adult son Richard.

18. A since-deceased Immigration and Naturalization Service (INS) officer, Sharon Cunningham, interviewed McIntosh and defendant about the marriage-based visa forms. (At the time defendant adjusted his status, INS was the primary immigration agency. Later, the INS split into three agencies, and USCIS took over adjudication of immigration benefits.)

19. There is not reliable evidence of what was said in the interview with Cunningham. Defendant does not remember what was said at the interview. Plaintiff did not ask McIntosh at trial about what was said at this interview, and the interview was not recorded. Although there were red check marks on the adjustment of status forms, USCIS policy on the use of check marks allowed marks to be made for various reasons—not only when a question was verbally asked and answered. And notations on the Form I-485 may reflect that either spouse answered the question.

20. Particularly in this case, the use of the red check marks on the form do not reliably reflect the questions that were asked and answered, or what those answers were. Cunningham's notations did not follow office policy. She did not make a list of the documents shown to her and did not photocopy the documents she was shown. It is also possible that Cunningham asked questions

at the interview without marking them on the form. For example, there is no check mark next to defendant's street address, but Firuccia testified that Cunningham had likely asked defendant his address. And there is no red check mark next to the question about the applicant's spouse, but Firuccia testified that Cunningham likely asked defendant if he was married. Cunningham also was required to verify defendant's signature on the Form I-485 by making a red check mark, but she did not make such a mark.

21. In this case, there is another reason that it is difficult to determine what was said in the interview: defendant's limited English and heavy accent. McIntosh testified that toward the beginning of their relationship, defendant spoke with an accent and was hard to understand, so he often had to repeat things. He could read some English, but his ability was limited.

22. After interviewing McIntosh and defendant and reviewing the evidence they provided, Cunningham wrote in her notes: "Sponsor stays home to care for handicapped son. Petitioner has two jobs. Joint checking, insurance, car. Appears to be bona fide."

23. Plaintiff granted defendant permanent residence.

24. Two years after defendant received permanent residence, defendant and McIntosh filed a Form I-751, seeking to remove the conditions on his permanent residence. Plaintiff approved the Form I-751. To approve it, USCIS had to determine, again, that defendant's marriage to McIntosh was a bona fide marriage.

   *C.     Defendant's Naturalization Application*

25. After he had been a permanent resident for three years, defendant hired an attorney to complete and file a naturalization application on his behalf—the Form N-400.

26. Defendant did not read the Form N-400 before he signed. The form submitted did not list defendant's ex-wife and children.

27. Defendant attended a naturalization interview with retired USCIS officer Carolyn Jacobs in Kansas City. No transcript or recording of this interview exists, and Jacobs does not remember the interview.

28. Jacobs did not follow the office policy in conducting naturalization interviews. First, witness Carol Sicoli has testified that the office policy was to ask questions at naturalization interviews verbatim, just as they are written on the Form N-400, "like a script." Jacobs, however, sometimes paraphrased questions. She did not make a record of when she paraphrased instead of reading verbatim. And she sometimes asked follow-up questions. Jacobs never made a list of the questions she had asked, and never made lists of the answers given.

29. Second, office policy required officers to make a red check mark on the Form N-400 next to a question only after reading the question aloud and receiving a verbal response affirming the written response on the form as given by the applicant. No red check mark could be made unless a verbal affirmation was received. But Jacobs testified that she made a check mark to show that she had asked a question—not as a confirmation that the interviewee affirmed the written answer.

30. Third, Jacobs asked questions during interviews without making a check mark. Jacobs acknowledged that on defendant's form, there are questions she thinks she asked, but which lack a check mark, including whether defendant's wife had a prior spouse.

31. Fourth, Jacobs testified that at times she made notes on sticky notes, which she then threw away after the interview. USCIS policy prohibits the use of sticky notes by adjudicators. If they are used, they should not be thrown away; they are to be transcribed into a memorandum and placed in the file.

32. Jacobs did not make the decision whether to grant naturalization. The naturalization application was decided by Elaine Howlett several years after the interview with Jacobs. Howlett did not speak with Jacobs about defendant's naturalization or what had occurred in the interview before approving the application. Howlett was not called as a witness at trial or deposed, and there is no testimony or other evidence in the record about whether Howlett would have made a different decision had she known that defendant had an ex-wife and children in Pakistan.

33. In December 2008, defendant received the "Notice of Naturalization Oath Ceremony" (Form N-445) indicating that his naturalization, which had been pending for five years, was being approved and that he would be able to take the naturalization oath or "Oath of Allegiance." The Form N-445 includes a series of questions that the applicant must answer. In January 2009, defendant attended an oath ceremony. At that time, he returned the Form N-445 to USCIS with answers marked on the back. Defendant marked on the Form N-445 that he had traveled outside the United States and that he had gotten divorced and remarried.

34. Defendant provided the Form N-445 when he spoke with an officer at his oath ceremony. An immigration officer interviewed defendant at that time about his eligibility for naturalization. Firuccia confirmed at trial that as a matter of policy, naturalization applicants are interviewed at their oath ceremonies, where a USCIS officer asks questions about the Form N-445. The agency uses this last interview to determine whether the applicant is "still eligible to naturalize" before they take the oath.

35. There is no record of what questions defendant was asked or what answers he gave during this interview. There is no record of which officer conducted this final interview. It is possible that defendant discussed his prior divorce and children with the officer at his oath ceremony.

36. It is also unclear whether the officer who conducted the final interview at the oath ceremony had defendant sign a sworn statement about his answers that day. Normally, when an applicant attends the oath ceremony with new information, as reflected on the applicant's Form N-445, USCIS will prepare a sworn statement "to get their testimony in a sworn format." There is no record of whether a sworn statement was prepared here, or if not, why not.

37. Defendant took the Oath of Allegiance and became a naturalized United States citizen.

## CONCLUSIONS OF LAW

**II.      Legal Standards - Denaturalization**

The government may seek denaturalization when a naturalized citizen either: (1) illegally procured naturalization; or (2) procured naturalization by concealment of material facts or by willful misrepresentation. 8 U.S.C. § 1451(a). To prevail under the first option, the government must show that the individual was statutorily ineligible to naturalize when he did so. *See Federenko v. United States*, 449 U.S. 490, 506 (1981). The second way the government may prevail is by showing that the individual procured naturalization by either concealment or misrepresentation, if the concealment or misrepresentation was willful, and if the fact at issue was material. *Kungys v. United States*, 485 U.S. 759, 767 (1988) (citing *Federenko*, 440 U.S. at 507, n.28). The government must "prove its charges in such cases by clear, unequivocal and convincing evidence which does not leave the issue in doubt." *Klapprott v. United States*, 335 U.S. 601, 612 (1949). When a court determines that the government has met its burden, it has no discretion to excuse the conduct. *Federenko*, 449 U.S. at 517. A judgment of denaturalization is required.

The court cannot set aside a grant of citizenship "upon a bare preponderance of evidence which leaves the issue in doubt." *Schneiderman v. United States*, 320 U.S. 118, 125 (1943). The evidence must be "unequivocal," meaning "proof that admits of no doubt, a burden approximating, if not

exceeding, that used in criminal cases." *Addington v. Texas*, 441 U.S. 418, 432 (1979). "[W]hen the attack is made long after the time when the certificate of citizenship was granted and the citizen has meanwhile met his obligations and has committed no act of lawlessness" the courts must "scrutinize the record with the utmost care." *Nowak v. United States*, 356 U.S. 660, 663 (1958); *see Maisenberg v. United States*, 356 U.S. 670, 673 (expressing grave doubts about the reliability of testimony about "events of many years before" of a "highly equivocal nature").

**III.     Discussion**

   *A.     Count I: Illegal Procurement of United States Citizenship Based on Failure to be Admitted for Lawful Permanent Residence*

United States citizenship is illegally procured when the naturalized citizen failed to comply with any congressionally-imposed prerequisite for naturalization. *See Fedorenko*, 449 U.S. at 506. To be naturalized, an applicant must have been lawfully admitted to the United States for permanent residence. *See* 8 U.S.C. § 1429. To have been "lawfully admitted for permanent residence," an applicant must show that he has been "lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws. . . ." *Id.* § 1101(a)(20). An immigrant who, at the time of application for admission, is not in possession of a valid unexpired visa, reentry permit, or other valid entry document is inadmissible. *Id.* § 1182(a)(7)(A)(i).

Moreover, an applicant is inadmissible if he seeks to procure a visa, other documentation, or admission into the United States by fraud or by willfully misrepresenting a material fact. *Id.* § 1182(a)(6)(C)(i). A misrepresentation is "willful" if it was "deliberate and voluntary." *See United States v. Hirani*, 824 F.3d 741, 749 (8th Cir. 2016). Deliberate and voluntary requires only knowledge of the falsity of the representation and does not require an intent to deceive. *Id.*

   1.     Validity of Marriage to Venita McIntosh

Defendant sought to become a lawful permanent resident based on his marriage to McIntosh, a United States citizen. But plaintiff claims that at the time defendant filed his I-485, defendant remained married to Kaneez Fatima in Pakistan. According to plaintiff, defendant's subsequent marriage to McIntosh was therefore invalid and could not lawfully confer any immigration status. The court disagrees.

The evidence in the case supports a factual finding defendant lawfully divorced Fatima in 2000. To be certain, plaintiff has failed to prove by clear and convincing evidence that defendant did <u>not</u> divorce Fatima in 2000. As noted above, the court finds credible Fatima's testimony that she and defendant were divorced. The court also finds credible the testimony of defendant's brother, Ishfaq Malik, who stated that he was a witness at the divorce, that it did in fact occur, and that he obtained the divorce records from the local Union Council in 2014. The court does not give significant weight to Bazil and Long's testimony suggesting that records were forged or inaccurate. In 2016, after questions were raised about whether the Union Council in Pakistan had maintained an accurate record of the divorce, including its register book, Ishfaq Malik obtained a judgment in the Court of Shahrukh Arjumand confirming that the 2000 divorce was lawfully entered.

The court finds that defendant was divorced in 2000, and therefore his marriage to McIntosh was valid and capable of conferring permanent resident status.

### 2. Fraud and Willful Misrepresentation

Plaintiff next argues that defendant procured his lawful permanent residence through fraud and willful misrepresentation of material facts by representing on his I-485 application and during his adjustment of status interview that he did not have an ex-wife or children. The problem with this argument is that plaintiff has not shown that the omissions were material to defendant's application.

The standard for materiality in denaturalization cases is high, requiring a two-part showing. *See Maslenjak v. United States*, 137 S. Ct. 1918, 1929 (2017) (considering materiality in the criminal context). First, the government must show that the misrepresented fact was relevant enough to a naturalization criterion that it would have prompted reasonable officials, seeking only evidence about citizenship qualifications, to undertake further investigation. *Id.* Second, if the government can meet that first showing, it then must prove that such an investigation would have borne disqualifying fruit. *Id.* The "clear, unequivocal, and convincing" standard applies in the materiality context, as well. *So Yen Lee v. INS*, No. 94-9508, 1994 WL 651990, at *2 (10th Cir. Nov. 18, 1994).

Courts have consistently held that failing to reveal a prior spouse on one's immigration forms is not material unless the existence of the prior spouse would have made the applicant ineligible for the benefit. *See United States v. Alferahin*, 433 F.3d 1148, 1152 (9th Cir. 2006). Failing to list a prior spouse on an immigration form is not material where "the visa would have been processed no differently if USCIS knew about a prior spouse." *Id.*

McIntosh testified credibly at trial that her marriage to defendant was not a sham marriage, but was instead based on love. In his deposition, defendant testified consistently. No contrary evidence was presented. As in *Alferahin*, defendant's failure to list his ex-wife and children on his forms was not material because that information did not affect whether defendant's marriage to McIntosh was bona fide and sincere. *Id.*

Furthermore, having an ex-wife and children would not have made defendant ineligible for adjustment of status. And ultimately, having an ex-wife by itself does not make one ineligible for naturalization. Omitting a spouse and children from a naturalization form would only make a difference if that prior marriage was not terminated. But the court has determined here that

defendant's prior marriage had been terminated before defendant married McIntosh. Defendant was therefore eligible for both adjustment of status and naturalization.

Plaintiff has failed to show by clear, unequivocal, and convincing evidence that the omissions on his immigration forms were material.

### B. *Count II: Illegal Procurement of United States Citizenship Based on Lack of Good Moral Character Through False Testimony*

A naturalization applicant must meet a "good moral character" requirement. 8 U.S.C. § 1427(a)(3). An applicant is statutorily barred from showing that he is a person of good moral character if he has given false testimony, under oath, for the purpose of receiving an immigration benefit. *Id.* § 1101(f)(6). The required statutory period for good moral character, when the applicant's naturalization application is based upon his marriage to a United States citizen, is three years. *See id.* § 1430(a). This includes the period between the examination and the administration of the oath of allegiance. 8 C.F.R. § 316.10(a)(1). Here, defendant must demonstrate "good moral character" between April 5, 2001, and the date he took the oath of citizenship—January 15, 2009.

The false testimony bar to good moral character applies "to only those misrepresentations made with the subjective intent of obtaining immigration benefits." *Kungys*, 485 U.S. at 780. An applicant's "[w]illful misrepresentations made for other reasons, such as embarrassment, fear, or a desire for privacy, [are] not deemed sufficiently culpable to brand the applicant as someone who lacks good moral character." *Id.* Plaintiff must prove both the existence of false sworn testimony and the applicant's "subjective intent" by clear, convincing, and unequivocal evidence. *Id.*; *United States v. Hovsepian*, 422 F.3d 883, 887–89 (9th Cir. 2005) (en banc).

Plaintiff has failed to prove false testimony was given because there is no reliable record of what testimony was given at any of defendant's interviews. It is possible to prove false testimony

-13-

when an officer testifies about what her red check marks meant. But where an officer only testifies about her "general practice" years before, that evidence cannot prove false testimony was given. *See Hajro v. Barrett*, 849 F. Supp. 2d 945, 958–63 (N.D. Cal. 2012). In this case, plaintiff failed to prove what the red check marks meant on any of the forms, because the officers did not follow USCIS policy. Plaintiff has failed to prove defendant gave false testimony at either interview. *Id.*

As noted above, fear of embarrassment or of angering one's spouse is not the "subjective intent" required for 8 U.S.C. § 1101(f)(6) to apply, because it is not the intent to gain an immigration benefit. *See*, *e.g., Chan v. INS*, No. 00 MISC 243(FB), 2001 WL 521706, at *8 (E.D.N.Y. May 11, 2001) (holding that the failure to disclose a spouse lacked the requisite subjective intent of offering false testimony to obtain an immigration benefit). Where an applicant failed to reveal facts because he would be embarrassed for his wife to find out, that type of omission cannot prove he intended to gain an immigration benefit by doing so. *See Lopez-Scavone v. INS*, 21 F. App'x 599, 602 (9th Cir. 2001) (finding misrepresentation was immaterial where "Lopez-Scavone repeatedly testified that writing the bad checks was wrong and that he recognized that it was, and that he hadn't even told his wife about the details at the time" and "[t]his testimony reveals that he was embarrassed about the writing of the checks, particularly about describing the details in the presence of his wife").

Plaintiff did not call defendant as a witness at trial and offered no evidence of what defendant's intent was in any of the purported false testimony or omissions on his forms. This lack of evidence is contrasted with several facts that suggest that any omission was (1) because defendant had not told McIntosh that he had an ex-wife and children, so he did not want to mark it on the paper; (2) because McIntosh completed the paperwork and did not know about the ex-wife and children; (3) because defendant did not speak or read English well and did not understand the question; or (4) because defendant did not review the paperwork before signing. The court has accepted that plaintiff married

McIntosh for love, which works against an inference that he was solely motivated to secure naturalization. To be certain, plaintiff has not shown by clear and convincing evidence that defendant intended to gain an immigration benefit by omitting information about his ex-wife and children.

### *C.  Count V: Illegal Procurement of United States Citizenship Based on Concealment of Material Facts and Willful Misrepresentation*

To revoke citizenship based on willful misrepresentation and concealment, the evidence must demonstrate that (1) the naturalized citizen misrepresented or concealed a fact; (2) the misrepresentation or concealment was willful; (3) the fact was material; and (4) the naturalized citizen procured citizenship as a result of the misrepresentation or concealment. *Kungys*, 485 U.S. at 767. Plaintiff has not established all four of these elements.

The first element is the only element of the four that is clearly and unequivocally met here. Defendant misrepresented or concealed the fact that he had an ex-wife and children in Pakistan. Whether these misrepresentations or concealments were willful is a closer question, however. Under the Immigration and Nationality Act, "[p]roof of an intent to deceive is not required; rather, knowledge of the falsity of the representation is sufficient." *See Witter v. INS*, 113 F.3d 549, 554 (5th Cir. 1997) (citations omitted). Defendant was well aware that he had an ex-wife and children. What is less clear is whether he was aware that he represented otherwise. Defendant may not have completed the paperwork himself, and it is possible he was not asked questions about the issue during his interviews.

Even if the court assumes that defendant willfully misrepresented, however, plaintiff has not shown that the facts were material or that defendant procured citizenship because he lied. There is no evidence in the record that defendant would have been denied naturalization if he disclosed his prior marriage or children. A misrepresentation or concealment is material if the misrepresentation would have had the "natural tendency to influence" the naturalization decision. *See Kungys*, 485 U.S. at 771–

72; *see also So Yen Lee*, 1994 WL 651990, at *1. As the court has already determined above, any misrepresentations or concealments by defendant were not material to his application. Importantly here, plaintiff did not present any testimony from Elaine Howlett—the decision-maker—to show that she would have denied defendant's naturalization had he disclosed his ex-wife and children. Jacobs made no recommendation after her interview, and did not speak with Howlett about the case. The court is left with no credible evidence to show that the decision would have been influenced by disclosure of defendant's former spouse and children.

Finally, plaintiff has not shown "procurement." To determine whether defendant procured his naturalization based on the misrepresentations and concealment, the court asks whether it is "fair to infer that the citizen was actually ineligible" for naturalization. *See United States v. Latchin*, 554 F.3d 709, 714 (7th Cir. 2009); *United States v. Mensah*, 737 F.3d 789, 809 (1st Cir. 2013). Such inference in this case is not fair because defendant has demonstrated that he was divorced before marrying McIntosh. He has shown that his marriage with McIntosh was bona fide. Plaintiff has not offered reliable or credible evidence that defendant lied under oath during interviews. And plaintiff has not submitted any other reason or evidence that defendant would have been ineligible for naturalization. On this factual basis, the court cannot conclude that defendant procured citizenship based on concealment of material facts and willful misrepresentation.

**IT IS THEREFORE ORDERED** that defendant's motion to exclude testimony of Drew Bazil (Doc. 177) is denied.

**IT IS FURTHER ORDERED** that defendant's motion to exclude testimony of Ryan Long (Doc. 176) is denied.

**IT IS FURTHER ORDERED** that judgment shall be entered in favor of defendant and against plaintiff on all counts.

The case is closed.

Dated this 9th day of May, 2019, at Kansas City, Kansas.

                                            **s/ Carlos Murguia**
                                            **CARLOS MURGUIA**
                                            **United States District Judge**